# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-10110-CIV-ALTONAGA/Goodman

**ELIZABETH MARQUARDT**,

     Plaintiff,

v.

**OCEAN REEF COMMUNITY ASSOCIATION**, *et al.*,

     Defendants.

_____/

### <u>ORDER</u>

**THIS CAUSE** came before the Court on Defendants, Ocean Reef Community Association ("ORCA") and David Ritz's Motion for Summary Judgment [ECF No. 65] filed January 14, 2020. Plaintiff, Elizabeth Marquardt, filed a Corrected Response [ECF No. 100] on March 5, 2020; to which Defendants filed a Reply [ECF No. 107] on March 11, 2020.[1] The Court has carefully considered the Amended Complaint [ECF No. 50], the parties' submissions, the record, and applicable law. For the following reasons, Defendants' Motion is granted in part and denied in part.

### I.     BACKGROUND

This case concerns allegations of gender discrimination, retaliation, hostile work environment, constructive discharge, and violation of the Equal Pay Act, 29 U.S.C. section 206(d). (*See generally* Am. Compl.). Plaintiff is the former Vice President and Chief Financial Officer of

---

[1] The parties' factual submissions include Defendants' Statement of Undisputed Material Facts ("Defs.' SOF") [ECF No. 66]; Plaintiff's Response to Defendants' Statement of Facts (*see* [ECF No. 86] 2–4) and Plaintiff's Statement of Additional Material Facts (*see* [ECF No. 86] 4–11) (collectively, "Pl.'s SOF"); and Defendants' Reply Statement of Material Facts ("Defs.' Reply SOF") [ECF No. 106].

ORCA. (*See id.* ¶¶ 1, 16). Defendant ORCA is a homeowners' association and Florida not-for-profit corporation. (*See id.* ¶ 2). Defendant Ritz is the former President of ORCA. (*See id.* ¶ 3).

Plaintiff was employed with ORCA from January 2016 to February 2018. (*See* Defs.' SOF ¶ 4).[2] Plaintiff led ORCA's finance department and was one of four vice presidents. (*See id.* ¶¶ 5, 8). The other vice presidents were Greg Lunsford, VP of Administration; Jeff Oeltjen, VP of Public Works; and Tim James, a VP and the head of Public Safety. (*See id.* ¶¶ 9–11). Plaintiff's starting salary was $150,000, which was higher than the respective salaries of Lunsford and Oeltjen. (*See id.* ¶ 12). Plaintiff reported to Ritz. (*See id.* ¶¶ 5, 8). Plaintiff communicated with James nearly daily and saw him in person approximately once a week. (*See* Pl.'s SOF ¶ 58).

Plaintiff alleges over the course of her employment there occurred numerous incidents, ranging from inappropriate comments to unwanted physical contact, that gave rise to, or were symptomatic of, a work environment hostile to women. (*See generally* Am. Compl.; Pl.'s SOF). Plaintiff reported some of the incidents to Ritz and other ORCA personnel and claims as a result she was ultimately constructively discharged. (*See* Pl.'s SOF ¶¶ 50, 65–66, 68, 73; Am. Compl. ¶¶ 42–45). Defendants dispute whether these incidents occurred, and the nature of the incidents, if they did. (*See generally* Mot.; Defs.' SOF; Defs.' Reply SOF). The Court reviews the incidents, grouped generally as follows.

### A.    Dress Code and Social Events

On multiple occasions, male ORCA employees socialized or attended events without Plaintiff. (*See* Defs.' SOF ¶ 29; Pl.'s SOF ¶ 29). These outings included golfing, shooting, attending a Miami Dolphins game, watching football, and testing a new public safety boat. (*See*

---

[2] Plaintiff disputes this timeline in part, stating her last day on ORCA's premises was January 23, 2018. (*See* Pl.'s SOF ¶ 4). Other citations to the parties' statements of material facts are undisputed unless otherwise noted.

Defs.' SOF ¶ 29).[3]  According to Defendants, these events were few, and Plaintiff was not invited to attend for various legitimate reasons, including she does not play golf or shoot, that the Miami Dolphins tickets were received from a vendor, and that male employees watched football together as friends outside of work.  (*See id.*).

Several work-sponsored employee events which included the entire staff involved water sports.  (*See id.* ¶ 34).  Plaintiff states her female colleagues expressed discomfort about attending these functions because of the prospect of wearing swimsuits at a work event.  (*See* Pl.'s SOF ¶ 70).  Plaintiff told her subordinates they were not required to wear swimsuits at the events.  (*See id.*).  Plaintiff voiced an objection to Ritz about the events, but he disregarded it.  (*See id.*; Defs.' Reply SOF ¶ 70).  There was no ORCA policy requiring employees to wear swimsuits at these events.  (*See* Defs.' SOF ¶ 34).

In the workplace, ORCA had a dress code for men but not for women.  (*See* Pl.'s SOF ¶ 69).  Plaintiff observed female employees wearing revealing clothing and asked Ritz to implement a dress code for women as well as men.  (*See id.*).  Ritz did not mandate female employees wear scantily-clad clothing (*see* Defs.' Reply SOF ¶ 70), but he declined Plaintiff's invitation to implement a dress code for women (*see* Pl.'s SOF ¶ 69; Defs.' Reply SOF ¶ 69).

## B.  Off-color Comments and Jokes about Female Employees

Plaintiff contends Ritz "invited or encouraged commentary regarding the appearance of the women in the office."  (Pl.'s SOF ¶ 71).  On two occasions, Plaintiff overheard ORCA members comment that female ORCA employees were attractive.  (*See id.*).  In both instances, Ritz agreed with the comments but did not solicit them.  (*See id.*; Defs.' Reply SOF ¶ 71).  Plaintiff informed Ritz one of the comments was inappropriate for the workplace, but Ritz responded she would have

---

[3] Defendants insist Plaintiff was invited on the boat ride (*see* Defs.' SOF ¶ 29), but Plaintiff states the invitation was only extended as the other VPs were departing (*see* Pl.'s SOF ¶ 30).

to excuse the commenter because he was from a different generation. (*See* Pl.'s SOF ¶ 71; Defs.' Reply SOF ¶ 71). On several occasions, Plaintiff heard Ritz state he convinced Oeltjen to work at ORCA for the "hot single women." (Pl.'s SOF ¶ 72 (internal quotation marks omitted); Defs.' Reply SOF ¶ 72). Plaintiff asked Ritz to stop repeating this comment, but Ritz rebuffed her. (*See id.*).

On another occasion, Ritz told a joke about how he ordered a car "in the ash." (Defs.' SOF ¶ 33 (internal quotation marks omitted)). Defendants contend the joke referred to the car's interior. (*See id.*). Plaintiff understood the joke to be about anal sex. (*See* Pl.'s SOF ¶ 71).

### C. Unwanted Touching

According to Plaintiff, she was twice hugged inappropriately at work, once in spring 2017 by an Ocean Reef Club board member and once in the fall 2017 by a public adjuster, a non-OCRA employee with whom Plaintiff worked. (*See* Pl.'s SOF ¶¶ 37, 67–68). After the first hug, Plaintiff complained to Ritz, who dismissed her concern and stated she should "put up with" the board member. (Pl.'s SOF ¶ 67 (internal quotation marks omitted); *see also* Defs.' Reply SOF ¶ 67). Plaintiff also complained to Ritz after the second hug, and he responded "Liz, you are the CFO. You just need to do whatever it takes to get our insurance money." (Pl.'s SOF ¶ 68 (internal quotation marks omitted); Defs.' Reply SOF ¶ 68). There are no allegations the individuals touched Plaintiff's breasts or private parts. (Defs.' SOF ¶¶ 23–25).

Plaintiff contends she "observed . . . multiple instances of James inappropriately touching female employees." (Pl.'s SOF ¶ 66 (alteration added)). Specifically, Plaintiff saw James hug three female employees in a manner which appeared to Plaintiff to make the employees uncomfortable. (*See id.*). Plaintiff reported the conduct to Ritz and Lunsford. (*See id.*). According to Defendants, James did not touch the employees' breasts or private parts and Plaintiff did not observe the women pushing James away or asking him to stop. (*See* Defs.' SOF ¶¶ 24–25).

In 2016, Plaintiff was informed James hit a female public safety officer under James's supervision, Hilary Matas, on the buttocks with a folder as she passed by him.  (*See* Defs.' SOF ¶ 26; Pl.'s SOF ¶ 61).[4]  Plaintiff did not witness the incident herself; James's assistant, Nicole Molnar, witnessed and reported it to the Monroe County Sheriff's Department.  (Pl.'s SOF ¶¶ 61–62; Defs.' Reply SOF ¶¶ 61–62).  An investigation ensued, but it was concluded that nothing had happened.[5]  (*See* Pl.'s SOF ¶ 62).  Matas resigned after the incident, as did Molnar.  (*See id.* ¶ 63).

Defendants do not dispute the resignations but dispute the "resignations had any connection to the allegation" James touched Matas inappropriately.  (Defs.' Reply SOF ¶ 63).  Defendants point out Matas stated in her resignation letter "I want to begin by saying how blessed I feel that I have been able to serve this community, none the less [sic] with the amazing leaders and personnel that have been at my side helping to mold me into the person I am today . . . ."  (Defs.' Reply SOF ¶ 63 (quoting May 13, 2016 Resignation Email [ECF No. 95] 1227 (internal quotation marks omitted))).[6]  James testified that he did not touch Matas on the buttocks but rather on her lower back with a file folder.  (*See* Defs.' Reply SOF ¶ 61).

After Matas resigned, James informed Lunsford that Matas had failed to give ORCA two weeks' notice.  (*See* Pl.'s SOF ¶ 64).  ORCA's policies provided employees who resign with less than two weeks' notice were not entitled to payment for accrued paid time off ("PTO").  (*See id.*).  Subsequently, an anonymous emailer under the name "Grpking" "broadcast[ed] . . . the Matas incident to several ORCA employees and board members."  (*Id.* (alterations added; first internal quotation marks omitted)).  Following the email, James asked ORCA's HR Director to compensate

---

[4] Plaintiff states she was informed of this incident prior to Matas's resignation.  (*See* Pl.'s SOF ¶ 26).

[5] Plaintiff states Ritz concluded nothing happened (*see* Pl.'s SOF ¶ 62); whereas Defendants state the Sheriff's Department concluded nothing happened (*see* Defs.' Reply SOF ¶ 62).

[6] The Resignation Email continues "I owe so much to both my Sergeant (Gus Herrera) and Corporal (Ronnie Fell) for their faith in me."  (May 13, 2016 Resignation Email).

Matas for her PTO. (*See id.*). According to Defendants, James's request HR compensate Matas had nothing to do with her resignation; on the contrary, "Mr. James advocated for Ms. Matas receiving a PTO Payout" because she arranged her resignation at a time that would not inconvenience her employer. (Defs.' Reply SOF ¶ 64).

### D. Interoffice Relationships and LeeAnn Yule's Sexual Harassment Claim

In the course of her employment, Plaintiff reported to ORCA board members Marshall Wishnack and Ken Dewey that Lunsford engaged in an inappropriate relationship with a subordinate, Yael Skinner. (*See* Pl.'s SOF ¶ 65). Ritz spoke with Lunsford, who denied Plaintiff's allegations, and Ritz concluded nothing improper occurred. (*See id.*; Defs.' Reply SOF ¶ 65).

Ritz engaged in an interoffice relationship with employee Monique Dagnesses. (*See* Pl.'s SOF ¶ 76; Defs.' Reply SOF ¶ 76). Another employee, Susan Ptomey, observed Ritz place his arms around Dagnesses in ORCA's office and believed Dagnesses "was not happy about it." (Pl.'s SOF ¶ 76 (internal quotation marks omitted; citing Ptomey Dep. [ECF No. 95] 908–31, 31:2–18)). Dagnesses testified she had a consensual adult relationship with Ritz, and that Ritz was not her boss and did not have supervisory authority over her. (*See* Defs.' Reply SOF ¶ 76 (citing Dagnesses Dep. [ECF No. 95] 890–906; 29:20-30:17). Dagnesses also testified Ritz never sexually harassed her, and she never saw or heard of Ritz inappropriately touching or harassing ORCA female employees. (*See id.*; Dagnesses Dep. 33:21–34:5).

During her employment, Plaintiff learned Ritz hired a woman, LeeAnne Yule, with whom he had a prior romantic relationship. (*See* Pl.'s SOF ¶ 74). Plaintiff contends Ritz created a position for Yule at ORCAT, an entity related to ORCA. (*See id.*).[7] According to Yule, whose Declaration (*see* [ECF No. 95] 1282–83) Plaintiff submits in support of her Response, Yule and

---

[7] Defendants state Plaintiff testified Yule was an employee of ORCA, not ORCAT. (*See* Defs.' Reply SOF ¶ 74).

Ritz dated in 2004, and Yule became employed at ORCAT in 2007, after her relationship with Ritz had ended. (*See* Yule Decl., Ex. A, Handwritten Notes [ECF No. 95] 1285–87).[8]

In 2009, Yule attended a Halloween function with Ritz while she was employed at ORCAT. (*See* Yule Decl. ¶ 3). At the event, Ritz directed her to pose and took several sexually suggestive photographs of her, which he displayed on a website. (*See id.*). Yule contends Ritz continually sexually harassed her after she was hired and submits several pages of handwritten notes along with her Declaration documenting incidents of harassment. (*See* Handwritten Notes 1285–87). Yule states Ritz groped and kissed her "anytime he was alone with her" at the ORCA and ORCAT offices, and points to two specific incidents of unwanted sexual touching in November[9] and December 2018. (*Id.* 1285; *see also id.* 1286). According to Yule, she "resigned [her] employment on or around September 2018, as a direct result of the hostile work environment [she] experienced, which continued unabated." (Yule Decl. ¶ 8 (alterations added)).

After Plaintiff resigned, she learned Yule had brought a sexual harassment lawsuit against Ritz. (*See* Defs.' SOF ¶ 54). Plaintiff was unaware of Yule's lawsuit while she was employed at ORCA. (*See id.*; Pl.'s SOF ¶ 54).

### E. Photographs of Nude Women on Ritz's Computer

Ritz maintained a website depicting photographs of nude women. (*See* Pl.'s SOF ¶ 75). The photographs were "not traditional photographs" but "were stylized and edited in an artistic manner such that the woman in the photograph could not be identified." (Defs.' Reply SOF ¶ 75). Plaintiff contends at least one of the photographs on the website was of Yule. (*See* Pl.'s SOF ¶ 75 (citing Yule Decl. ¶ 6); Defs.' Reply SOF ¶ 75). As noted, Yule states Ritz took multiple

---

[8] Yule declares the handwritten notes "accurately reflect the events described therein" and the "references to events in 'November' and 'December' occurred during the year 2017." (Yule Decl. ¶ 2).

[9] Based on the handwritten notes, it does not appear the November incident occurred in an ORCA or ORCAT office.

photographs of her and displayed them on his website while she was employed at ORCAT. Yule states, Ritz maintained the website until 2018. (*See* Yule Decl. ¶¶ 6–7). Ritz testified he "probably" took down the website containing the nude photographs in 2012. (*See* Defs.' Reply SOF ¶ 75 (citing Nov. 19, 2019 Ritz Dep. [ECF No. 67-4] 7:15–20).

A former ORCA employee, Jim Underwood, discovered several of Ritz's stylized nude photos on ORCA's computer network. (*See* Pl.'s SOF ¶ 75 (citing Underwood Decl. [ECF No. 95] 1275–76 ¶ 5)). Upon discovering the photographs in a folder titled "Artwork," Underwood asked Ritz's assistant to remove them. (*See* Underwood Decl. ¶ 5). ORCA board member Gary List testified he saw the photographs, although his testimony is unclear whether he saw the photographs prior to or in the course of an investigation into Ritz's workplace misconduct. (*See* Pl.'s SOF ¶ 75; Dec. 12, 2019 List. Dep. [ECF No. 95] 550–625, 7:20–21).

## F. Plaintiff's Reports of Alleged Misconduct; Hurricane Irma Bonus

In December 2017, Plaintiff attended a lunch meeting with Ritz and Lunsford where she "again elevated alleged harassment of female staff by James." (Pl.'s SOF ¶ 73; Defs.' Reply SOF ¶ 73). Plaintiff later met with Ritz in his office, but Ritz dismissed her complaint. (*See* Pl.'s SOF ¶ 73). Ritz told Plaintiff, "[w]e didn't have a CFO before and we don't need one in the future." (Defs.' SOF ¶ 41 (alteration added; internal quotation marks omitted); *see also* Pl.'s SOF ¶ 73). Plaintiff did not ask Ritz what he meant by this comment. (*See* Defs.' SOF ¶ 41). Plaintiff understood the comment "to mean that if she continued to complain about James, her job would be in jeopardy." (Pl.'s SOF ¶ 73). Also, in December, Plaintiff emailed ORCA's board members[10] a "law firm circular regarding the duties of the Board in investigating sexual harassment." (*Id.*).

---

[10] Defendants state Plaintiff sent the circular to Wishnack and List only, not the entire ORCA board. (*See* Defs.' Reply SOF ¶ 73).

According to Plaintiff, she was "thereafter denied a bonus given to her male counterpart, Oeltjen, for the same work Plaintiff had done in securing hurricane insurance proceeds for ORCA." (*Id.*). Plaintiff asserts she handled several Hurricane Irma-related tasks in addition to her usual job duties from September 2017 through January 2018. (*See id.* ¶ 82). Plaintiff worked 12-hour days in the weeks leading up to and after Hurricane Irma. (*See id.*). She worked daily with Oeltjen and shared tasks, including surveying damage in the field and gathering information relevant to ORCA's insurance claims, inventorying damage, attending regular meetings with public adjusters and contractors, and submitting information to public adjusters. (*See id.*). Plaintiff explains her work on Hurricane Irma insurance claims "was equivalent to a second-full time job to which Plaintiff devoted approximately thirty additional hours every week." (*Id.*).

Defendants do not dispute Plaintiff's description of her work (*see* Defs.' Reply SOF ¶ 82) but contend Ritz awarded a $10,000.00 bonus to Oeltjen because of his "additional duties and remarkable performance throughout the Hurricane Irma event" (*id.* ¶ 45 (citing Nov. 19, 2019 Ritz Dep. [ECF No. 95] 167–204, 28:19–29:8; 24:18–25:19)). Defendants emphasize prior to the hurricane, Oeltjen worked on the ORCA premises and completed physical work, while Plaintiff worked remotely; that Oeltjen "worked 10–12 hour days the week immediately after Hurricane Irma, and even slept two nights at ORCA;" and following Irma, unlike Plaintiff, Oeltjen was responsible for various Hurricane-repair and clean-up tasks. (*See id.* ¶¶ 47–48). Defendants point out the work was performed by Oeltjen and the public works department, not Plaintiff and the finance department. (*See id.* ¶ 48).

In December 2017, after her lunch meeting with Ritz, Plaintiff asked Ritz whether she would also receive a hurricane bonus. (*See* Pl.'s SOF ¶ 81). Ritz testified he conferred with Wishnack and Wishnack declined to issue Plaintiff a bonus. (*See id.* (citing Nov. 19, 2019 Ritz Dep. 32:19–33:2). Wishnack does not recall Ritz asking him about Plaintiff's bonus. (*See id.*;

Defs.' Reply SOF ¶ 81). Ritz received approval from Wishnack to award Oeltjen a bonus. (*See* Pl.'s SOF ¶ 81). Ritz testified he decided to award Oeltjen a bonus in November 2018 (before the lunch meeting), but the form memorializing Ritz's decision to award Oeltjen's bonus was signed by Ritz on December 11, 2017. (*See id.* (citing Personnel Action Form [ECF No. 95] 1212)).

Plaintiff asked Ritz about the basis for Oeltjen's bonus. (*See id.* ¶ 81 n. 9). Plaintiff testified Ritz informed her Oeltjen received a bonus for "all the work after the hurricane" and "all the work in getting the hurricane claim together." (*Id.*, Oct. 21, 2019 Marquardt Dep. [ECF No. 95] 308–94, 205:23–24; 211:22–24). Defendants contend the "work after the hurricane" and the "work getting the hurricane claim together" were two different tasks. (Defs.' SOF ¶ 81 (internal quotation marks omitted)). Plaintiff testified when she asked Ritz why she did not receive a bonus, Ritz stated "Well, it wasn't in the budget. We'll have to see. Maybe I can do something about it." (Oct. 21, 2019 Marquardt Dep. 212:1–3).

### G. Threatened and Actual Demotions of Female Employees

At the December 2017 meeting attended by Plaintiff, Lunsford, and Ritz, Lunsford reported ORCAT Director Susan Hershey had objected to James repeatedly "creeping out" female ORCA employees during visits to ORCA. (Pl.'s SOF ¶ 77 (internal quotation marks omitted; quoting Oct. 21, 2019 Marquardt Dep. 139:1)).[11] One week after the meeting, Ritz proposed to Plaintiff that Hershey be demoted and her salary be cut by $10,000.00. (*See id.*). Defendants do not dispute Ritz proposed demoting Hershey but dispute the insinuation Ritz's proposal was connected to Hershey's complaint about James. (*See* Defs.' Reply SOF ¶ 77).

---

[11] Plaintiff's precise testimony was, "And [Lunsford] added that, Susan Hershey from ORCAT had also complained to him confidentially about Tim [James] going to ORCAT and making the women feel uncomfortable. He used the phrase 'creeping **them** out.' When [Lunsford] and I told David about those things, [Ritz] did nothing to stop it." (Oct. 21, 2019 Marquardt Dep. 138:22–139:3 (alterations and emphasis added)).

Sometime after James was hired, another female employee, Barbara Fassett, submitted a complaint to HR. (*See* Pl.'s SOF ¶ 78 (citing Fassett Dep. [ECF No. 95] 8–45); Defs.' Reply SOF ¶ 78). Fassett testified that she and the entire public safety group, including male employees, submitted an HR complaint about James. (*See* Fassett Dep. 47:13–48:6). Fassett was later demoted and received a $14,000.00 pay cut. (*See* Pl.'s SOF ¶ 78; Fassett Dep. 8:22–24). After her demotion, Fassett reported to two male employees whom she previously trained. (*See* Fassett Dep. 9:11–15). Defendants insist Fassett did not complain about James's misconduct, but (along with other female and male employees) complained she was not happy with the public safety department in general. (*See* Defs.' Reply SOF ¶ 78 (citing Fassett Dep. 47:13–48:10)).

Following Fassett's demotion, Plaintiff sent a message to List stating, "Barb[ara Fassett] was demoted and this gives me great concern from a gender discrimination liability perspective since she is the only experienced female paramedic. And she is very good at her job from all reports." (Pl.'s App., Ex. 20 [ECF No. 95] 1158). List did not specifically respond to Plaintiff's comment regarding Fassett's demotion. (*See id.*).

*      *      *

On December 7, 2017, James announced his resignation, but on January 19, 2018, Plaintiff learned James rescinded his resignation and would be staying at ORCA. (*See* Defs.' SOF ¶ 42). Three days later, Plaintiff resigned. (*See id.* ¶ 43). Plaintiff submitted a resignation letter (*see* Resignation Letter [ECF No. 67-22]), starting the reasons for her resignation, including James's alleged sexual harassment. (*See generally* Resignation Letter).

After Plaintiff's resignation, ORCA initiated an investigation in response to the allegations in Plaintiff's resignation letter. (*See* Pl.'s SOF ¶ 60 (Wishnack Dep. [ECF No. 95] 747–898, 36:19–39:4)). Ritz was terminated without cause by the ORCA board in 2019. (Pl.'s SOF ¶ 60; Defs.' Reply SOF ¶ 60). Plaintiff contends James "also departed his employment in 2019 following the

ORCA Board's decision to give James the choice to resign or be terminated by ORCA." (Pl.'s SOF ¶ 60). According to Plaintiff, Ritz and James departed ORCA as a result of the investigation prompted by her resignation letter. (*Id.*). Defendants dispute Plaintiff's assertion. (Defs.' Reply SOF ¶ 60).

This lawsuit followed. Plaintiff brings claims against ORCA for retaliation under Title VII, the Florida Civil Rights Act ("FCRA") and the Florida Whistleblower Act ("FWA) (Counts I and II); hostile work environment under Title VII and the FCRA (Count III); constructive discharge due to hostile work environment under Title VII and the FCRA (Count IV); gender discrimination under Title VII and the FCRA (Count V); and against ORCA and Ritz for violation of the Equal Pay Act (Count VI). Defendants seek summary judgment as to all claims for relief.

## II.    LEGAL STANDARD

Summary judgment may only be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court draws all reasonable inferences in favor of the party opposing summary judgment. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000).

"Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts." *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-cv-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citation omitted). Indeed, "[i]f reasonable minds might differ on the inferences arising from

undisputed facts, then the Court should deny summary judgment" and proceed to trial. *Id.* (alteration added; citations omitted).

### III. ANALYSIS

#### A. Hostile Work Environment and Constructive Discharge (Counts III and IV)

A claim for hostile work environment requires that Plaintiff show (1) she belongs to a protected group; (2) she has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) the harassment was based on Plaintiff's sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and create a discriminatorily abusive working environment; and (5) there is a basis for holding Plaintiff's employer liable. *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)). "Establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (citations omitted). In order to prove constructive discharge, Plaintiff "must demonstrate a *greater* severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir.1992) (emphasis added; citation omitted). Because the Court finds Plaintiff has not proffered evidence that Defendants' alleged harassment was "sufficiently severe or pervasive to alter the terms and conditions of [her] employment," *Gupta*, 212 F.3d at 582, Plaintiff's hostile work environment and constructive discharge claims may not proceed to trial.

Quite simply, Plaintiff's disputed facts are insufficient to establish an intolerable working environment when read against prevailing Eleventh Circuit law. Preliminarily, the Court notes because Plaintiff was unaware of Yule's sexual harassment lawsuit against Ritz and the photographs on Ritz's website, Plaintiff may not rely on these allegations to support her hostile

work environment and constructive discharge claims. *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1245 (11th Cir. 2014) (noting "an employee alleging a hostile work environment cannot complain about conduct of which he was oblivious for the purpose of proving that his work environment was objectively hostile")

Absent these facts, the Court reviews Plaintiff's evidence, construed in the light most favorable to her, and assesses Plaintiff's evidence against Eleventh Circuit precedent. Plaintiff presents evidence that over the course of her two-year employment:

- She was excluded from several events attended by her male colleagues (*see* Pl.'s SOF ¶ 29);

- She was subjected to two unwanted hugs, which hugs Ritz indicated Plaintiff should tolerate (*see id.* ¶¶ 37, 67–68);

- She objected to offensive gender-based comments from ORCA members, which comments Ritz indicated Plaintiff should tolerate (*see id.* ¶ 71);

- Ritz made at least six offensive gender-based comments, including one joke about anal sex (*see id.* ¶ 72);

- She witnessed James hug three female employees, and the employees appeared uncomfortable (*see id.* ¶ 66); and

- She was aware James was accused of hitting an employee on the buttocks with a folder (*see id.* ¶ 61).

Even assuming the hugs Plaintiff observed were sexual in nature (which contention Defendants dispute (*see* Mot. (3–5)), the described conduct is less "severe and pervasive" than other conduct failing the summary judgment bar in this Circuit. In analyzing hostile work environment, the "fourth element — that the conduct complained of was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment — is the element that tests the mettle of most sexual harassment claims." *Gupta*, 212 F.3d at 583 (quotation marks and citation omitted). Regarding conduct of a gendered or sexual nature, courts consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is

physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* at 584 (quoting *Mendoza*, 195 F.3d at 1246; internal quotation marks omitted).

In this respect, *Gupta* is instructive. Noting Title VII is "not a general civility code," *id.* at 583 (internal quotation marks omitted; quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)), the *Gupta* court found a plaintiff-employee's allegations her defendant-colleague (1) frequently commented on her appearance; (2) frequently called her at night and on the weekends and asked about her boyfriend; (3) made isolated comments about the superiority of men compared to women and compared women to meat; (4) once unbuckled his belt and pulled down his zipper to tuck his shirt in when the plaintiff walked in on him in his undershirt;[12] (5) once placed his hand on the plaintiff's knee; and (6) once lifted up the hem of the plaintiff's dress when inquiring about the material, did not constitute conduct sufficiently severe or pervasive to overcome summary judgment. *See id.* at 584–86. In so reasoning, the *Gupta* court (1) emphasized the plaintiff "failed to present evidence [the defendant]'s conduct was in any way physically threatening or humiliating," *id.* at 586 (internal quotation marks omitted; quoting *Mendoza*, 195 F.3d at 1246); and (2) noted "[a]ll of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment[,]" *id.* (alterations added; internal quotation marks omitted; quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) (citations omitted)). As in *Gupta*, "[t]his is not such a case." *Id.* (alteration added). The conduct shown by Plaintiff is certainly inappropriate, but it did not "permeate" Plaintiff's day-

---

[12] The plaintiff stated her colleague "was expecting [her] to come pick up a book from his office." *Gupta*, 212 F.3d at 579 (alteration added).

to-day environment when viewed against *Gupta*, which concerned much more frequent conduct than that shown to have taken place here.

*Guthrie v. Waffle House, Inc.*, 460 F. App'x 803 (11th Cir. 2012), also guides the Court's analysis. In *Guthrie*, the plaintiff alleged her colleague grabbed her buttocks multiple times, "talked dirty" to her (including saying he wanted to "fuck" her and "lick her all over"), repeatedly asked her on dates, and stated "Baby, we need to talk," while putting his arms around her shoulders when the plaintiff informed him she would be filing a sexual harassment lawsuit. *Id.* at 804–05 (internal quotation marks omitted). The court found (1) the plaintiff did not show she subjectively perceived the harassment and (2) the harassment was not objectively pervasive enough to support a Title VII claim. *See id.* at 806–07.

Plaintiff contends *Guthrie* is distinguishable because the plaintiff in *Guthrie* "did not subjectively perceive the environment to be hostile; i.e., she remained at work for nearly two additional years after the alleged harassment." (Resp. 20). Yet, the same can be said about Plaintiff regarding her testimony James touched Matas on the buttocks — the most severe of Plaintiff's incidents supporting her hostile work environment claim. According to Plaintiff, she "learned about the [Matas] incident prior to Matas'[s] resignation" (Pl.'s SOF ¶ 26 (alterations added)), and Matas resigned by e-mail on May 13, 2016 (*see id.* ¶ 63). Plaintiff did not resign until 2018.

Plaintiff urges the Court to follow *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798 (11th Cir. 2010), but *Reeves* is distinguishable. In *Reeves*, a Title VII gender-discrimination case, the court reversed summary judgment in favor of the defendant-employer where the plaintiff claimed (1) offensive conduct "occurred on a daily basis"; (2) "[n]early every day . . . co-workers turned the office radio to a crude morning show," featuring graphic discussions of women's anatomy; and (3) the plaintiff's co-workers "regularly sang songs about gender-derogatory topics."

*Id.* at 804 (alterations added; internal quotation marks omitted). The plaintiff testified "if you were to pull out a calendar right now . . . I could point at every day of the year that some of this behavior went on. It went on every day." *Id.* (alteration added; internal quotation marks omitted).

In comparison, Plaintiff alleges Ritz made six specific inappropriate comments (Ritz's joke about anal sex and the five occasions Ritz repeated he convinced Oeltjen to work for ORCA because of the "hot single women"); two instances where Ritz tolerated or accepted comments about the ORCA female staff's appearance; three instances where James hugged female employees; two instances where Plaintiff was hugged by non-ORCA employees; and the incident where James allegedly hit Matas on the buttocks with a folder. These instances do not reach the frequency required under *Gupta* and *Reeves*. Neither, when compared to *Gupta* and *Guthrie*, are Plaintiff's facts as severe.

Finding the frequency and severity of the conduct weigh against Plaintiff's case, the Court turns to whether the conduct was physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interfered with Plaintiff's job performance. *See Mendoza*, 195 F.3d at 1246. Most certainly, hitting a subordinate on the buttocks with a file folder is physically humiliating. As noted, however, the incident occurred well before Plaintiff resigned and there is no record evidence Plaintiff complained about the incident to Ritz.

As to the other incidents of physical conduct (those Plaintiff experienced and witnessed), although Plaintiff states they caused discomfort or embarrassment (*see* Pl.'s SOF ¶¶ 66–67), she does not contend she or her female colleagues felt threatened or humiliated. Finally, Plaintiff does not show Ritz's or James's comments or behavior interfered with her job performance, notwithstanding Plaintiff's frequent contact with both men. Defendants emphasize Plaintiff received only positive performance reviews and salary increases (*see* Defs.' SOF ¶¶ 12, 16), and

the Court can identify no evidence prior to Plaintiff's resignation tending to show her work product suffered because of the allegedly hostile environment.

Viewed in the light most favorable to Plaintiff, the record does not raise a triable issue of fact that the conduct experienced by Plaintiff was "sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and create a discriminatorily abusive working environment." Plaintiff's hostile work environment and constructive discharge claims in Counts III and IV, respectively, fail.

### B.      Retaliation Claims (Counts I and II)

Plaintiff brings two retaliation claims, the first under Title VII and the FCRA and the second under the FWA. The Court addresses these claims together because "retaliation claims under the FCRA are substantively similar to Title VII retaliation claims," *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 n.4 (11th Cir. 2010) (citation omitted), and "the summary judgment analysis for a Title VII retaliation claim [is] applied to a claim of retaliatory discharge under the Florida Whistleblower Act[,]" *Rutledge v. SunTrust Bank*, 262 F. App'x 956, 957–58 (11th Cir. 2008) (alterations added).

"To establish a prima facie case of retaliation, the plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal link between the two." *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (citation and footnote call number omitted). "When analyzing a retaliation claim based on circumstantial evidence, we usually employ the *McDonnell Douglas* analytical framework." *Calvert v. Doe*, 648 F. App'x 925, 928 (11th Cir. 2016) (citation omitted). Under the *McDonnell Douglas* three-part, burden-shifting analysis: (1) the plaintiff must establish a prima facie case of retaliation; and if so (2) the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its employment decision; and if it does (3) the burden shifts back to the plaintiff to establish the reason offered by the

defendant was not the real basis for the decision, but mere pretext for discrimination. *See Johnson v. Miami-Dade Cty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (citations omitted).

"However, the *McDonnell Douglas* framework 'is not the *sine qua non* for a plaintiff to survive summary judgment in a discrimination case.'" *Calvert*, 648 F. App'x at 929 (quoting *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013)). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (citation, internal quotation marks, and footnote call number omitted). A "plaintiff will always survive summary judgment if [she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* at 1328 (alteration added; citations omitted). A plaintiff may present a "convincing mosaic" through circumstantial evidence consisting of "(1) suspicious timing, ambiguous statements, similar behavior directed at other members of the protected group, and 'other bits and pieces from which an inference of discriminatory intent might be drawn'; (2) systematically better treatment of those outside the protected class; and (3) pretext in the employer's justification." *Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 976 (11th Cir. 2014). Plaintiff argues her case survives summary judgment as analyzed either under the *McDonell Douglas* framework or under *Smith*'s "convincing mosaic" standard. The Court agrees.

***Prima facie case***. Plaintiff makes a prima facie case for retaliation. As noted, Plaintiff must show (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal link between the two.

Plaintiff's opposition to "ORCA's discriminatory and hostile treatment of women" (Compl. ¶ 31) and her "informal reports of illicit conduct to her supervisor Ritz" (Resp. 7) constitute statutorily protected activity. "A plaintiff engages in statutorily protected activity when [she] complains about an action that [she] reasonably believed was unlawful under Title VII." *Banks v. iGov Techs., Inc.*, 661

F. App'x 638, 645 (11th Cir. 2016) (alterations added; citation omitted). "[T]he protection afforded . . . extends as well to those . . . who informally voice complaints to their superiors or who use their employers' internal grievance procedures." *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) (alterations added; citations omitted). "Statutorily protected expression includes . . . complaining to superiors about sexual harassment." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (alteration added; citing *Rollins*, 868 F.2d at 400). "[T]his standard has both a subjective and an objective component." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (alteration added).

"[P]laintiff must not only show that [she] *subjectively* (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, but also that [her] belief was *objectively* reasonable in light of the facts and record presented." *Id.* (alterations added; emphasis in original). A plaintiff may have a "reasonable good faith belief" she was being sexually harassed even where the "conduct [] complained about was not so severe and pervasive that it altered her working conditions[.]" *Gupta*, 212 F.3d at 586 (alterations added; internal quotation marks and citations omitted); *see also id.* at 586, 592 (finding the plaintiff made a prima facie case for retaliation notwithstanding her failure to show alleged sexual harassment was severe or pervasive).

Plaintiff reported James's inappropriate conduct to Ritz at least three times. (*See* Pl.'s SOF ¶¶ 67–69, 71, 73). Plaintiff also reported to Lunsford that James hit Matas on the buttocks with a file folder. (Pl.'s SOF ¶ 66; Defs.' Reply SOF ¶ 66; *see also* Marquardt Dep. 178:2–10).[13] These various reports constitute statutorily protected activity. *See Rollins*, 868 F.2d at 400.

---

[13] In her Response, Plaintiff states "[A]t [the] December 2017 lunch meeting, . . . Plaintiff again reported her objection that James had previously been accused of touching the rear end of an ORCA employee, Hilary Matas." (Resp. 6 n. 6 (alterations added)). Plaintiff cites to her own deposition at 229:14–15 and 174:5–12, but those citations do not contain testimony supporting Plaintiff's assertion she reported the Matas incident at the lunch meeting. Indeed, Plaintiff testified she did not talk to Ritz about the propriety of him investigating the Matas incident (*see* Oct. 21, 2019 Marquardt Dep. 179:20–21); but instead, discussed the incident with Lunsford, who Plaintiff testified "had been handling human resources at ORCA for a while[.]" (*Id.* 179:4–5 (alteration added); *see also id.* 178:5–7; 179:2–5).

Defendants' argument Plaintiff did not have an "objectively reasonable belief regarding alleged harassment by James" (Mot. 14 (capitalization omitted); *see also id.* 14–15; Reply 6–7) fails to persuade.[14] Plaintiff's "retaliation claims are not exclusively based upon isolated instances of hugging." (Resp. 8). Moreover, Plaintiff need not establish all elements of a sexual harassment claim in order to have reasonably believed sexual harassment was taking place. *See Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1058 (11th Cir. 1999) ("The fact that the jury concluded [the plaintiff]'s claim did not meet all the elements for a successful sexual harassment action does not mean . . . [the plaintiff] could [not] have reasonably believed himself the victim of sexual harassment." (alterations added)).

Regarding Plaintiff's perception of James's conduct, "hugs" may be sexual when viewed in the context of other objectionable conduct. *See Bryars v. Kirby's Spectrum Collision, Inc*., CIV.A. 08–283, 2009 WL 1286006, at *12 (S.D. Ala. May 7, 2009) (reviewing unwanted physical contact (including hugging) and verbal comments holistically and concluding the plaintiff "established a genuine issue of material fact as to whether the physical contact initiated by [the defendant] was because of Plaintiff's sex" (alteration added)); *see also Tingle v. City of Birmingham*, No. 4:12-cv-8, 2013 WL 5295766, at *13, 18 (N.D. Ala. Sept. 18, 2013) ("[H]ugging and touching the plaintiff's knee are not necessarily sexual acts. However, in the context of the other undisputed conduct . . . and resolving all inferences in favor of the plaintiff, the court concludes that there is a genuine issue of material fact as to whether the conduct was sexual." (alterations added; citation and internal quotation marks omitted)). At the time Plaintiff complained about James's "hugs," she was also aware of allegations James had hit Matas on the

---

[14] Defendants also argue under the Florida Whistleblower Act Plaintiff must, but did not, establish she complained about an actual violation of a law, rule, or regulation. (*See* Mot. 16). Plaintiff responds, correctly, the Court has previously found "[f]or purposes of summary judgment . . . Plaintiff must only prove she had a good-faith reasonable belief in the violation of the law *at the time she objected to Defendants*." *Villaman v. United Parcel Serv., Inc.*, No. 18-21377-Civ, 2019 WL 922704, at *6 n.2 (S.D. Fla. Feb. 8, 2019) (alterations added; emphasis in original).

buttocks with a folder, and Plaintiff previously discussed those events with Lunsford, who oversaw HR complaints. (*See* Pl.'s SOF ¶ 66; Marquardt Dep. 178:2–10). Based on the foregoing facts, it cannot be said Plaintiff's complaints about James were objectively unreasonable. *See Gupta*, 212 F.3d at 586 ("Although the conduct Gupta complained about was not so severe and pervasive that it altered her working conditions, we cannot say that she lacked a 'reasonable good faith belief' that she was being sexually harassed.").

Plaintiff identifies two adverse employment actions: the denial of her bonus and her constructive discharge. The Court focuses on the former. The "allegation [the plaintiff was denied a bonus payment] . . . is sufficient to constitute an adverse employment action." *Lees v. Dynamic Educ. Sys., Inc.*, No. 306-cv-1106, 2008 WL 821997, at *11 (M.D. Fla. Mar. 26, 2008) (alterations added). Plaintiff's burden to show a causal link between the protected activity (her complaints about James) and the adverse action at the prima facie stage is low; she need only show "that the protected activity and the adverse action were not wholly unrelated." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (internal quotation marks and citation omitted). A short period of time between the protected activity and the adverse employment action may show causation for the purposes of a prima facie case. *See Embry v. Callahan Eye Found. Hosp.*, 147 F. App'x 819, 830–31 (11th Cir. 2005). Here, Plaintiff asserts Ritz decided to award Oeltjen a bonus and withheld one from Plaintiff in the same month she made her last complaint about James's inappropriate conduct. (*See* Pl.'s SOF ¶ 82).

***Defendants' Justification for their Employment Decision***. Defendants do not contest Plaintiff was not given a bonus but argue "the record makes crystal clear why Oeltjen received a bonus for his Hurricane Irma work and Plaintiff (along with two other male VPs) did not." (Reply 16). Not so. While Oeltjen worked 10–12 hours per day the week preceding Hurricane Irma and was responsible for various Hurricane-related clean up tasks, Plaintiff's "work on ORCA's

Hurricane Irma insurance claims was equivalent to a second-full time job to which Plaintiff devoted approximately thirty additional hours every week." (Pl.'s SOF ¶ 82). Plaintiff further contends she "worked on a daily basis with Oeltjen on shared tasks that included surveying damage in the field to gather information relevant to ORCA's insurance claims; inventorying damage; attending regular meetings with public adjusters and contractors; and submitting information to public adjusters, among other tasks." (*Id.*). Plaintiff also asked Ritz why she had not received a bonus and he replied not that Oeltjen had completed different work, but that there was not room in the budget. (*See* Oct. 21, 2019 Marquardt Dep. 212:1–3).

***Evidence of Pretext***. Even if Defendants offered clear, legitimate, non-discriminatory reasons for awarding Oeltjen a bonus and not Plaintiff, Plaintiff presents evidence of pretext. "A plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (alteration adopted; citations and internal quotation marks omitted). The Court considers "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (internal quotation marks and citation omitted).

Plaintiff points to the discrepancy between Ritz's testimony he asked Wishnack about Plaintiff's bonus and Wishnack's testimony he did not recall Ritz's inquiry. (*See* Pl.'s SOF ¶ 81; Defs.' Reply SOF ¶ 81). Plaintiff also correctly notes the record is "replete with evidence of Ritz's own gross misconduct as it relates to the ORCA female work force." (Resp. 16). While Plaintiff was unaware of many of the allegations of Ritz's misconduct (including Yule's sexual harassment suit and Ritz's website with sexually suggestive photographs, including a photograph of Yule),

Plaintiff is correct an employee may introduce evidence of harassment of which she is not personally aware to prove her employer is responsible for the harassment or to rebut an affirmative defense. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1285–86 (11th Cir. 2008). The Court agrees with Plaintiff a "jury could conclude that ORCA's and Ritz's proffered business justifications are thin cover for Ritz's retaliation against Plaintiff and sexualized views of women in the workplace." (Resp. 16).

Plaintiff's retaliation claims may proceed.

### C.     Discrimination and Violation of the Equal Pay Act (Counts V and VI)

Plaintiff argues she presents a genuine issue of material fact for gender discrimination based upon disparate treatment and hostile work environment. (*See* Resp. 17–18). The Court only considers Plaintiff's theory of disparate treatment given it has already concluded Plaintiff's hostile work environment claim fails. To make a prima facie case for gender discrimination Plaintiff must show (1) she was a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently. *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012) (citation omitted).

Defendants do not contest the first or second elements. (*See* Mot. 19–20; Reply 6). As to the third element, Defendants argue "Plaintiff testified that the reason she did not receive the same bonus as Oeltjen was because she complained about James's treatment of women. Accordingly, Plaintiff is not alleging that the Hurricane Irma bonus supports her gender discrimination claim." Mot. 19 (citation and footnote call number omitted)). The Court disagrees. Defendants offer no case law supporting the contention Plaintiff's discrimination claim cannot rely on the same allegation of adverse action (here, the denial of Plaintiff's bonus) as her retaliation claim. (*See* Resp. 17). The law indicates the opposite. *See Crawford v. Carroll*, 529 F.3d 961, 969, 975 (11th Cir. 2008) (finding a negative performance evaluation resulting in the plaintiff being denied a pay

increase supported the plaintiff's retaliation claim as well as her disparate pay claim). Defendants'
subsequent assertion the "only conduct Plaintiff relies upon for her gender discrimination claim is
. . . she was excluded from social outings" (Mot. 19–20 (alteration added)) misses the mark.

As to the fourth element, Plaintiff has presented evidence a similarly situated individual
outside her protected class — Oeltjen — was treated differently. Working under the *McDonnell
Douglas* framework, the "proper test for evaluating a comparator" requires that Plaintiff show the
comparator is "similarly situated [to Plaintiff] in all material respects." *Lewis v. City of Union
City, Georgia*, 918 F.3d 1213, 1218 (11th Cir. 2019) (citation and second internal quotation marks
omitted). Courts consider whether the employee and the alleged comparator engaged in the same
basic conduct (or misconduct); shared similar employment or disciplinary histories; were subject
to the same employment policy, guidelines, or rules; or were under the jurisdiction of the same
supervisor. *See id.* at 1227. Plaintiff and Oeltjen were both vice presidents, reported to Ritz, and
worked substantially long hours on Hurricane Irma-related tasks. (*Compare* Defs.' SOF ¶ 47
(stating Oeltjen worked 10 to 12-hour days the week immediately after Hurricane Irma) *with* Pl.'s
SOF ¶ 82 (stating Plaintiff worked 12-hour days in the week leading up to and the week after
Hurricane Irma)). Although Defendants contend Oeltjen's work was qualitatively different from
Plaintiff's, they fail to dispute Plaintiff's assertion she and Oeltjen "shared tasks that included
surveying damage in the field to gather information relevant to ORCA's insurance claims;
inventorying damage; attending regular meetings with public adjusters and contractors; and
submitting information to public adjusters." (Pl.'s SOF ¶ 82; Defs.' Resp. SOF ¶ 82). Neither do
Defendants dispute Plaintiff's testimony that at least part of the reason Oeltjen received a bonus
was for the work "getting the insurance claim together." (Defs.' SOF ¶ 81 (internal quotation
marks omitted)). Given the foregoing, Plaintiff presents a prima facie case for disparate treatment.

Further analysis of Defendants' alleged non-discriminatory reason for the adverse employment action (the denial of Plaintiff's bonus) and Plaintiff's evidence of pretext is not necessary, as the Court has already reached conclusions on these points. Therefore, Plaintiff's gender discrimination claim may proceed.

The conclusion is the same with respect to Plaintiff's claim for violation of the Equal Pay Act. Considering its previous analysis, the Court finds unavailing Defendants' argument "Plaintiff's Response "does nothing to show how Oeltjen's on-site operational work was similar to that done by Plaintiff in connection with the insurance claim." (Reply 11). As Plaintiff correctly notes, under the Equal Pay Act, she "need not prove that her job and those of the comparators are identical; the test is one of substantiality, not entirety." *Saridakis v. S. Broward Hosp. Dist.*, 681 F. Supp. 2d 1338, 1352 (S.D. Fla. 2009) (quotation marks and citation omitted). What matters is whether there is a triable issue of fact Plaintiff was paid less than a male employee for similar work. *See id.* at 1353. There is one.[15]

## IV.   CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendants, Ocean Reef Community Association and David Ritz's Motion for Summary Judgment **[ECF No. 65]** is **GRANTED** in part and **DENIED** in part. Defendants' Motion is **DENIED** with respect to **Counts I**, **II**, **V**, and **VI**. Summary judgment in favor of Defendant ORCA is granted as to **Counts III** and **IV**.

---

[15] Defendants devote little space to briefing Plaintiff's Equal Pay Act claim. Defendants do not discuss any difference in the evidentiary standard between a disparate-treatment discrimination claim and an Equal Pay Act claim other than generally averring the standard for determining whether jobs are equal in terms of skill, effort and responsibility is high. Stated otherwise, Defendants do not attempt to explain why judgment should be entered on Plaintiff's Equal Pay Act claim even where Plaintiff's discrimination claim moves forward.

**DONE AND ORDERED** in Miami, Florida, this 9th day of April, 2020.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record